**HART–CARTER COMPANY,**
**Plaintiff–Appellant,**

v.

**HCC, INCORPORATED,**
**Defendant–Appellee.**

No. 95–1626.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 12, 1995.

Decided Oct. 10, 1995.

Rehearing Denied Nov. 30, 1995.

William Dunnegan (argued), New York City, Karl L. Felbinger, Felbinger & Felbinger, Northbrook, IL, for Plaintiff–Appellant.

Thomas P. Heneghan, Eric M. McLeod (argued), Michael, Best & Friedrich, Madison, WI, Robert A. Weiner, McDermott, Will & Emery, New York City, for Defendant–Appellee.

Before POSNER, Chief Judge, and BAUER and MANION, Circuit Judges.

POSNER, Chief Judge.

The district judge granted summary judgment for the defendant in this diversity breach of contract suit, and the plaintiff has appealed. The material facts are not in dispute. In 1987, the management of a division of the plaintiff, Hart–Carter, bought the division, creating HCC, the defendant. The division manufactured a device called a "floating cutter bar," which is the key part of a "header," which is the part of a combine that cuts the crop. In the course of the negotiations leading up to the buy-out agreement, the parties learned that the John Deere company was threatening to sue Massey–Ferguson, which manufactures headers, for patent infringement and that Massey–Ferguson, whose headers included floating cutter bars made by Hart–Carter, was threatening to turn around and sue Hart–Carter, seeking indemnification on the basis of a promise by the latter, presumably in its contract to sell floating cutting bars to Massey–Ferguson (but the contract is not in the record), to indemnify Massey–Ferguson should the latter incur liability to John Deere. The contract must have bound Hart–Carter's successors and assigns, thus including HCC; for the parties to the buy-out, Hart–Carter and HCC, inserted into the buy-out agreement a provision that HCC would pay one-half of all expenses, including attorneys' fees, incurred in connection with the litigation of "any claims made by Massey–Ferguson ... as described in Exhibit 8 for so long as [HCC] shall continue to produce and sell the products and/or components that are the subject of such claims." Exhibit 8 to the agreement, captioned "List of Pending and Threatened Litigation," explains that Massey–Ferguson had written Hart–Carter "that it has been charged by John Deere Company with infringement of Deere Patent No. 3,982,383 ... and that it is looking to Hart–Carter for indemnification ... because Hart–Carter supplies ... components ... of the Massey–Ferguson MF 9100 Series floating cutter bar headers."

After the buy-out, the division that was now HCC did not manufacture any more floating cutter bars for Massey–Ferguson's MF 9100 series, but it did manufacture floating cutter bars for a different series of Massey–Ferguson headers, the MF 9750 series. Meanwhile, in 1988 Deere had brought the expected suit for patent infringement against Massey–Ferguson. The case went to trial in 1991, and the court held that the patent was valid and was infringed by both the MF 9100 series and the MF 9750 series. Massey–Ferguson, which had impleaded Hart–Carter in the patent suit, sought indemnification from Hart–Carter. Its theory was that the floating cutter bars supplied to it by Hart–Carter and its successor HCC (for whose conduct the indemnification agreement made Hart–Carter liable) had infringed the Deere patent, causing Massey–Ferguson's header, in which the floating cutting bar was incorporated, also to infringe. The parties settled Massey–Ferguson's claim for damages, and Hart–Carter then demanded that HCC pay half the expense of the defense and settlement. HCC refused, precipitating this suit. The district court dismissed the suit, holding that HCC's duty of cost sharing was limited by the terms of the contract to the manufacture of floating cutter bars for Massey–Ferguson's 9100 series, and HCC had not manufactured any of those cutter bars.

The district court thought the meaning of the buy-out agreement plain on its face. HCC had a duty to pick up half of Hart–Carter's litigation costs if HCC manufactured the products referred to in Exhibit 8, and Exhibit 8 designated components of the MF 9100 header as those products. HCC did not manufacture components of the MF 9100 series, but components for a different series. Hence no liability.

We do not think that this reading is either compelled by the language of the agreement or consistent with the evident purpose of the relevant provisions. The duty of cost sharing is imposed for as long as HCC shall produce the products "that are the subject of [Massey–Ferguson's] claims" described in Exhibit 8. Exhibit 8 describes these as claims for indemnification against Hart–Carter arising out of a contract between it and Massey–Ferguson. One such claim, it turns out, is based on the manufacture of floating

cutter bars for the MF 9750 series. It is true that this claim did not exist when the buy-out agreement was signed, because the MF 9750 series did not yet exist, and it is also true that Exhibit 8 explains that the basis of the claim for indemnification is that Hart–Carter supplied components for the 9100 series. But nothing in the language of the agreement limits the duty of cost sharing to existing claims, and the reference to the 9100 series is better understood as explaining the origin of Massey–Ferguson's demand for indemnification than as setting bounds to the scope of the duty of indemnification. After all, "MF 9100 Series" is just a name. It would be preposterous if, as a consequence of Massey–Ferguson's deciding to rename the series "MF 9750," HCC could manufacture the identical floating cutter bar incorporated in the 9100 header without any duty to share with Hart–Carter the costs of indemnifying Massey–Ferguson for liability arising out of the infringing character of the floating cutter bar. HCC concedes the absurdity of this, concedes therefore that if the floating cutter bar that it manufactured for the MF 9750 header differed not at all or only trivially from the floating cutter bar that Hart–Carter had manufactured for the MF 9100 header it would have to share the costs of defending against and settling Massey–Ferguson's claim for indemnification. By making this concession, HCC admits that the contract cannot properly be read as confining the duty of cost sharing to components of the MF 9100 header.

HCC points to evidence that the floating cutter bar that it made and sold for the MF 9750 header was very different from the one that Hart–Carter had made and sold for the MF 9100 series. That is not the point. The point is that the floating cutter bar that HCC made for the MF 9750 was a subject of Massey–Ferguson's claim for indemnification from Hart–Carter. No more is required to trigger HCC's duty to share the costs of responding to the claim. This interpretation fits the language of the contract, and also its evident purpose. Hart–Carter was getting out of the business of manufacturing floating cutter bars. It would have no control over the operations of its successor, HCC, yet by virtue of its indemnification agreement with

Massey–Ferguson it might have to pay Massey–Ferguson money in consequence of decisions unilaterally taken by HCC, specifically a decision to manufacture products that might infringe the Deere patent, triggering liability by Massey–Ferguson to Deere and a corresponding duty of Hart–Carter to indemnify Massey–Ferguson for that liability. To protect itself from its successor's actions that might impose liability upon it, Hart–Carter negotiated the cost-sharing agreement. For the protection to be effective, the agreement had to be co-extensive with HCC's power to do things that would trigger Hart–Carter's duty to indemnify Massey–Ferguson. Otherwise HCC could unilaterally shift the cost of precipitating Massey–Ferguson's infringing the Deere patent to Hart–Carter. Put differently, under HCC's interpretation Hart–Carter conferred a gratuitous benefit on it by settling a claim by Massey–Ferguson based not only on what Hart–Carter had done but also on HCC's independent decision to manufacture a floating cutting bar for the MF 9750 header.

Of course parties do not always negotiate the provisions that seem sensible, efficient, or equitable to a court. Hart–Carter might have wanted effective protection against HCC's precipitating a claim for indemnification of Massey–Ferguson yet have failed to get it, perhaps being compensated elsewhere in the contract; or it may simply have been outfoxed. But we do not understand HCC to be making any such arguments. It is content to argue that the contract is unambiguous in its favor. It is not.

We have considered whether to remand the case for an evidentiary hearing to explore the meaning of the cost-sharing agreement. Hart–Carter has the better of the argument concerning that meaning but we cannot be certain that it is correct, and a hearing to explore the negotiations leading up to the agreement might enable a more confident judgment. But since neither party wants an evidentiary hearing—both want the case decided on the basis of the record compiled in the summary judgment proceeding, although Hart–Carter makes a back-up request for a hearing if we are not fully convinced by its argument—it is likely either that an eviden-

168

tiary hearing would turn up nothing of value or that the parties simply do not want to bear additional costs of litigation, and either is a compelling reason to decide the case on the basis of the record we have. Neither party, moreover, argues that we should defer to the interpretation of the contract by the district court, but, as is conventional if not perhaps inevitable, they treat the interpretation of a written contract as a question of law on which appellate review is plenary. In these circumstances, our conclusion that Hart–Carter's interpretation of the contract is more persuasive than HCC's leads us to reverse the decision of the district court and direct the entry of judgment in favor of Hart–Carter.

REVERSED.